IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Kenitha Laney,                                    :

               Plaintiff           :        Civil Action 2:08-cv-00919

    v.                                            :

Ohio Department of Youth Services,                :        Magistrate Judge Abel

             Defendant             :

                                           :

**ORDER**

Plaintiff Kenitha Laney, a juvenile correctional officer at Madison Juvenile
Correctional Facility, brings this action against defendant Ohio Department of Youth
Services ("ODYS"), asserting claims that she was discriminated on the basis of her sex,
race, and religion. This matter is before the Court on defendant ODYS's March 8, 2010
motion for summary judgment (doc. 45).

**I.      Background**

Beginning October 9, 2006, plaintiff Kenitha Laney was employed as a
probationary juvenile corrections officer ("JCO"). On September 21, 2007, Laney was
forced to resign in lieu of termination. Laney maintains that she was denied the right to
wear a head scarf in observance of her religious ritual. She also maintains that she was
harassed by management and co-workers on the basis of her sex and race. Laney

complained to her supervisor, James Koss, and Trisha Butler and Amy Grover in human resources, and Julia Hines in the Equal Employment Office. Laney was less than one month away from completing her one year probationary period. Had she completed the probationary period, she would have been afforded union protection and could only have been terminated in accordance with the collective bargaining agreement. ODYS maintains that she was terminated for sleeping on duty.

Laney's co-worker, JCO Tate submitted a written statement that Laney had been sleeping while on duty on September 1, 2007. Tate reported that Laney had been wrapped up in a blanket and did not respond to her. JCO Tate made a similar complaint about Laney on the following day.  Paul Warye, the superintendent of the Marion juvenile correctional facility, reviewed the video from the security cameras during the times Laney worked on those dates. The September 1, 2007 video shows that at 9:16 a.m., an individual sat down with a white blanket. From 9:20 a.m. until 9:38 a.m., the person under the white blanket made little or no movement.  The September 2, 2007 video shows an individual sitting in front of the television, wrapped in a blanket. From 8:30 a.m. until approximately 9:33 a.m., the individual was up and down. From 9:33 a.m, the individual remained wrapped in a blanket in a chair with little movement until 10:01, when she was approached by someone. She was up briefly, and then sat down at 10:04 a.m. and did not move again until 10:39 a.m. when someone spoke to her and she got up. *See* Laney Dep., Exh. W. Based on this video recording, Warye concluded that Laney was not fulfilling her duty to ensure the safety of everyone the unit. In her

deposition, Laney was unwilling to acknowledge that the video was depicting her, and the quality of the video is not of sufficient quality to clearly identify the identity of the individual under the blanket. Laney confirmed that she worked on Bravo 6 on September 1st and 2nd and that the video was taken of Bravo 6. Laney Dep. 339:3-20. Her co-worker on those dates was JCO Tate, a white female. Laney testified that she on occasion wrapped herself in a blanket because she was anemic and sensitive to the cold.

On September 17, 2007, Warye received an incident report from a security guard at Grady Memorial Hospital. The security guard reported that Laney had been sleeping on duty when she was supposed to be guarding a youth who was receiving treatment at the hospital. Laney disputes the hospital security guard's account of the facts.

Warye met with Laney and informed that he had received disturbing information concerning her. She was offered the opportunity to resign or face termination. Although she initially refused to resign, Laney ultimately submitted the paperwork necessary to effectuate her resignation.  Laney Dep. 86-87.

## II.     Arguments of the Parties

### A.     Defendant Ohio Department of Youth Services

ODYS argues that Laney is unable to provide any direct evidence of discrimination based on race or sex because she cannot show any discriminatory employment policy or an express statement by a decision-maker of a desire to terminate employees because they belong to a protected class.

Defendant also argues that Laney cannot establish a prima facie of racial or gender discrimination. Defendant maintains that the only potential adverse action taken against Laney was Warye's intent to recommend that she be removed. According to defendant, Laney identified three alleged adverse actions taken by ODYS because of her race: (1) she was closely monitored by management; (2) her co-workers alleged that she brought in contraband; and (3) members of management pointed out that there were gaps in the lines of youths. With respect to her claim for discrimination based on her sex, Laney alleges that members of management pointed out to her when gaps formed in her lines of youth, and an operations manager informed her on one occasion that her shoes were not in conformance with the uniform policy. Defendant maintains that these alleged actions fall far short of what constitutes a material change in the terms or conditions of her employment.  ODYS also argues that Laney cannot show that she was replaced by a non-minority employee or demonstrate that she was treated less favorably than similarly-situated employees outside of her protected class.

ODYS maintains that it had legitimate, non-discriminatory business reasons for seeking to remove Laney before the end of her probationary period. Warye reviewed videos of Laney sleeping while on duty and believed that she had fallen asleep on consecutive nights while guarding an inmate at Grady Memorial Hospital. Defendant maintains that Laney cannot show that ODYS's proffered reasons for recommending that she be removed before the end of her probationary period were pretextual.

Defendant further argues that Laney's claims of harassment by her supervisor were not based on her race or sex and that the totality of the circumstances does not establish an actionably severe and pervasive environment. Defendant maintains that Laney also cannot demonstrate employer liability. Laney simply alleges that her supervisor, Huebner, harassed her when he attempted to correct her poor job performance, but she does not allege that he made any racial or sexist slurs in doing so. Defendant further argues that Laney cannot show a severe and pervasive race- or sex-based hostile work environment because the facts on which she relies are sparse and sporadic and do not amount to an actionable hostile work environment. ODYS maintains that even if Laney could demonstrate the existence of a hostile work environment based on race, she cannot show that it was indifferent or unreasonable.

With respect to plaintiff's claim that ODYS failed to accommodate her religious beliefs when Huebner instructed her to remove her head-scarf also must fail because she cannot show that she informed ODYS about the conflict and that she was discharged or disciplined for failing to comply with the conflicting requirement.

ODYS argues that it should be granted summary judgment on Laney's claims for retaliation because she failed to exhaust her administrative remedies for these claims. ODYS also argues that even if she did exhaust her administrative remedies, Laney cannot make out a prima facie case because she cannot show that she engaged in protected activity or that ODYS took any retaliatory actions against her. ODYS argues

that Laney also cannot show that ODYS's legitimate, non-discriminatory reasons were mere pretext.

In response to Laney's memorandum in opposition, ODYS argues that Laney's memorandum in opposition contains brand new claims and inadmissible allegations in an attempt to confuse the Court into believing that there are genuine issues of material fact. Laney relies on unsubstantiated allegations and claims that her unverified accusations constitute disputed material facts. Defendant also contends that Laney has attempted to convert her claim of failure to accommodate her religious belief into a disparate treatment argument.

Defendant argues that Laney cannot prove the existence of a disputed material fact by relying on the probable cause finding by the Ohio Civil Rights Commission. With respect to her race discrimination claim, ODYS argues that Laney fails to demonstrate that she suffered any adverse employment action or that she was treated differently than other similarly situated white juvenile correction officers. ODYS also maintains that plaintiffs fails to demonstrate pretext.  ODYS further argues that Laney's mixed-motive claim is not supported by evidence sufficient to create a material issue of fact, and the evidence revealed no connection between the alleged discriminatory acts and Warye's decision that recommend that Laney be terminated.

With respect to Laney's sex discrimination claim, ODYS argues that she failed to support her allegations with admissible evidence. ODYS maintains that cannot show

that the alleged harassment was based upon her race or sex, nor can she show that the alleged harassment was severe or pervasive.

ODYS argues that Laney has failed to demonstrate that a genuine issue of material fact exists regarding her claim of religious discrimination because ODYS had a legitimate, non-discriminatory business reason for recommending that Laney be removed. Laney has not offered any evidence to suggest that the stated reasons for her removal were actually a pretext for discrimination.

ODYS maintains that Laney failed to exhaust her administrative remedies regarding her claims for retaliation. ODYS further argues that plaintiff failed to come forth with evidence that she engaged in a protected activity under Title VII. Simply complaining of "harassment," does not mean that she engaged in protected activity under Title VII. Laney testified that she never told Vinson that her complaints were based on her race or sex. ODYS also points to unrebutted evidence that Warye was not aware of Laney's alleged complaints at the time that he gave her the option or resigning or face termination. Laney also failed to show that ODYS's nondiscriminatory reason fro recommending removal was pretextual.

### B.    Plaintiff Kenitha Laney

Laney maintains that she was treated differently that other similarly situated employees. Although the other juvenile corrections officers received all the proper training necessary to her perform her job, Laney was left out of two mandatory training sessions. At his deposition, operations manager Huebner testified that a

7

juvenile corrections officer should be provided all the proper training before a decision is made to remove them. Laney, however, was removed without the benefit of completing all of the training. Plaintiff further contends that she never received her probationary performance evaluations as required by ODYS policy.

According to plaintiff, she was harassed and reprimanded for her line movements and was accused of bringing in contraband. Plaintiff also points to accusations that she was not properly watching the juveniles. She maintains, however, that her white counterparts were not reprimanded for inadequacies in their line movements and for bringing in contraband. Laney also asserts that one juvenile corrections officer threw coffee on a youth, and another one broke a youth's arm. A third correction officer's underwear and photographs were found in a youth's room. None of these officers was forced to resign.

Laney denies that she ever fell asleep while working. She argues that other employees, however, were caught sleeping, but they were not fired or asked to resign for this conduct. Laney further alleges that Huebner harassed her because of her rapport with the youths, her line movements, and her head scarf. She maintains that Huebner solicited statements about her from youth and staff and had other staff watch her. Laney maintains that her complaints to management, human resources, and labor relations concerning the harassment were never investigated.

Plaintiff also alleges a claim for religious discrimination. Kenitha Laney started practicing Islam in February 2007. As part of her religious faith, God instructed her to

8

wear a black head scarf over her head. In April 2007, plaintiff maintains that she was forced to remove her head scarf when other employees were not forced to remove head gear or otherwise corrected for being out of uniform. Plaintiff suggests that the request to remove her head scarf prompted the chain of events that ultimately led to her removal from ODYS. In May 2007, Laney was left off of the training schedule. She also failed to receive her performance evaluations, and Huebner placed her under surveillance.

Plaintiff also argues that defendant's motion for summary judgment should also be denied with respect to her claim for retaliation. Plaintiff asserts that she began complaining to Operations Manger Clark and Assistant Deputy Superintendent Vincent of harassment in June 2007. In September 2007, plaintiff complained of harassment and discrimination to Tricia Butler. Laney also contacted the EEO officer, Julia Hines, prior to her removal or forced resignation. According to plaintiff, because none of the alleged inappropriate conduct was substantiated, reasonable minds could conclude that the adverse action taken against her was in retaliation for her complaints about harassment and discrimination that she made to management, human resources, labor relations, and the EEO office.

Laney argues that her claims for discrimination should be analyzed under the "mixed-motive" framework rather than under *McDonnell Douglas Corporation v. Green*, 411 U.S. 248 (1981).

Plaintiff also argues that the Court should not ignore the fact that the Ohio Civil Rights Commission made a finding of probable cause. According to plaintiff, courts have routinely found than an EEOC report can be highly probative of the ultimate issues. Plaintiff asks the Court to review the findings of the Commission, which she maintains demonstrates that there are disputes of fact and makes summary judgment improper.

In the event that the Court concludes that this is not a mixed-motive case, plaintiff maintains that she can make a prima facie case of discrimination. Laney, an African American female, went through training with other juvenile corrections officers. Laney was hired at the same time as Christine Tate, a Caucasian female.

## III.    Summary Judgment

Summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986) (emphasis in original); *Kendall v. The Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 247-248.  The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978).  Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting Systems, Inc.*, 368 U.S. 464, 467 (1962); accord, *County of Oakland v. City of Berkeley*, 742 F.2d 289, 297 (6th Cir. 1984).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (footnote omitted). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.*, 630 F.2d 1155, 1158 (6th Cir. 1980).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a

11

showing sufficient to establish the existence of an element essential to that party's case

and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986). The mere existence of a scintilla of evidence in support of the

opposing party's position will be insufficient; there must be evidence on which the jury

could reasonably find for the opposing party. *Anderson*, 477 U.S. at 251 (quoting

*Improvement Co. v. Munson,* 14 Wall. 442, 448 (1872)). As is provided in Fed. R. Civ. P.

56(e):

> When a motion for summary judgment is made and
> supported as provided in this rule, an adverse party may not
> rest upon the mere allegations or denials of his pleading, but
> his response, by affidavits or as otherwise provided in this
> rule, must set forth specific facts showing that there is a
> genuine issue for trial. If he does not so respond, summary
> judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his . . . [pleadings] in

opposition to a properly supported motion for summary judgment against him." *First*

*National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 259 (1968)(footnote omitted).

## V.  Discussion

Plaintiff argues that defendant's motion for summary should not be granted in

part on the basis of the probable cause finding of the Ohio Civil Rights Commission. *See*

doc. 6-2. The letter of the Ohio Civil Rights Commission does not contain any of the

facts upon which it relied to make its findings. As a result, this letter cannot be used to

create a genuine issue of material fact. *See Muir v. Chrysler LLC*,  563 F. Supp. 2d 783, 788

(N.D. Oh. 2008)("Without any record of the EEOC's analysis or the information upon

12

which it relied, its finding alone does not bind or persuade the Court and falls short of creating a genuine issue of material fact.").

### A.     Race Discrimination

Title VII provides that it is unlawful for an employer "to discharge any individual, or otherwise . . . discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a). Defendant argues that it is entitled to summary judgment on Laney's claims of race discrimination. Plaintiff initially bears the burden of establishing a prima facie case of employment discrimination. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).

Plaintiff argues that this case should be analyzed pursuant to *White v. Baxter*, 533 F.3d 381 (6th Cir. 2008) because she presents a mixed-motive claim. Under *White*, to survive a motion for summary judgment, a Title VII plaintiff asserting a mixed-motive claim must produce evidence that the defendant took an adverse employment action against the plaintiff, and race was a motivating factor for the defendant's adverse action. *Id*. at 400. "A mixed-motive claim can defeat an employer's motion for summary judgment by presenting evidence–either direct or circumstantial–to 'demonstrate' that protected characteristic 'was a motivating factor for an employment practice, even though other factors also motivated the practice.'" *Id.* (Citations omitted.)

13

Plaintiff points to the fact that the OCRC found probable cause to support her allegation of race discrimination and harassment. Plaintiff also relies on the fact that she was accused of not properly watching the youths and bringing in contraband. She maintains that she was unfairly reprimanded for her line movements. Plaintiff also contends that she could have had her probationary period extended as was done for another juvenile corrections officer.

In her deposition, Laney testified that she was criticized for gaps between the youths in her line movements. She believed that these criticisms were made because of her race. Laney Dep. 91:11-96-9. Laney could not identify by name any of the white juvenile corrections officers that should have been disciplined for gaps in their lines but were not.  Laney said that the white juvenile corrections officers that were not disciplined were also probationary employees. *Id.* at 96:6-9. Plaintiff offers no evidence beyond Laney's testimony, and that testimony is hearsay. On the other hand, defendants points to the uncontroverted testimony of JCO Marcus Patterson that Huebner always corrected all JCOs, regardless of their race or gender, about problems with line movements. (Patterson Dep. 34-35.) Laney also testified that she had unfairly received a nondisciplinary correction because one of her youth was riding a food cart even though she was in front of the line and could not see him. *Id.* at 97:5-10.

Laney testified that JCO Decker called her a black bitch several times. *Id.* at 99:16-23. JCO Hampton told youth that Laney was a black bitch and that she could not wait for the day she would get "walked out." *Id.* at 100:7-10. Laney felt as though she were

14

monitored more closely than the other JCOs because of her race. *Id.* at 101:20-102:3. She also believed that she was accused of bringing in contraband in part because of her race. *Id.* at 102:20-101:7. She believed that Warye's statement that he was going to terminate her was because of her race. *Id.* at 105:11-16. Laney also testified that some JCOs informed her that the operations manager asked them to write a statement about her, although some of them refused to do it.  *Id.* at 113:17-23.

In her deposition, Laney testified the JCO Halverson was caught sleeping on third shift by an operations manager. Laney did not know if he was disciplined for this, but she said that he was still on probation at the time this occurred because he was hired after her.  *Id.* at 158:23-159:24. Laney had no first hand knowledge of this alleged incident or how ODYS handled it. This testimony is inadmissible hearsay. Plaintiff offered no other evidence regarding the Halverson sleeping incident.

Plaintiff has not supported her opposition to defendant's motion for summary judgment with anything other than her beliefs that actions taken by defendant were motivated in part by her race. While it may be true that she was subjected to close monitoring and investigated for giving contraband to youths, these facts, standing alone, do not suggest that the actions were motivated by race. Here, plaintiff has failed to come forward with any admissible evidence from which a trier of fact could find that discrimination was even partly motivation for her termination.

In the alternative, plaintiff maintains that she can also establish a prima facie case of race discrimination under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).

15

A plaintiff can establish a prima facie case of discrimination by showing by a preponderance of the evidence: (1) that she is a member of a protected group; (2) that she was subject to an adverse employment decision;[1] (3) that the employer took an adverse employment action against her despite her qualifications; and (4) that she was treated less favorably than a similarly situated person outside of the plaintiff's protected class. *Johnson v. University of Cincinnati*, 215 F.3d 561, 572-73 (6th Cir. 2000) (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). A plaintiff may satisfy the fourth element by showing "that similarly situated non-protected employees were treated more favorably than the plaintiff." *Talley v. Bravo Pitino Restaurant, Ltd*, 61 F.3d 1241, 1246 (6th Cir. 1995).

If the prima facie case is established, the employer must articulate a legitimate, non-discriminatory reason for the termination. *See McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the burden of production then shifts to the plaintiff to show that the proffered reason is a pretext for discrimination. *See id.* at 804. The plaintiff at all times retains the burden of persuading the fact finder that she has been the victim of

---

[1]In *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999), the Sixth Circuit defined an adverse employment action as a "materially adverse change in the terms and conditions of [plaintiff's] employment." An adverse employment action in a retaliation case constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789,798 (6th Cir. 2004)(quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998)).

intentional discrimination.  *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Laney has failed to establish a prima facie case of discrimination for her termination because she has not identified any similarly situated comparable employee.

> It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly-situated *in all respects. Stotts v. Memphis Fire Department,* 858 F.2d 289 (6th Cir.1988). Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

*Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)(emphasis in original). The Sixth Circuit has clarified what it means when it said comparables must be similarly-situated in all respects absent other circumstantial or statistical evidence supporting an inference of discrimination:

> Although this statement appears to invite a comparison between the employment status of the plaintiff and other employees in every single aspect of their employment, *Mitchell* has not been so narrowly construed. In *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796 (6th Cir.1994), this court explained that the plaintiff was simply "required to prove that all of the *relevant* aspects of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation." *Id.* at 802 (emphasis added); *see also Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir.1997) (citing *Mitchell* in support of the proposition that "[t]o make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all *relevant* " (emphasis added)); *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995) (quoting *Pierce* ); *Byrd v. Ronayne,* 61 F.3d 1026, 1032 (1st Cir.1995). . . . *Mitchell* itself only relied on those factors relevant to the factual context in which the *Mitchell* case arose-an allegedly

discriminatory disciplinary action resulting in the termination of the plaintiff's employment. We held that to be deemed "similarly-situated" in the disciplinary context, "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell,* 964 F.2d at 583. These factors generally are all relevant considerations in cases alleging differential disciplinary action. *Cf. Pierce,* 40 F.3d at 802 . . . Courts should not assume, however, that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in *Pierce,* the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the *relevant* aspects." *Pierce,* 40 F.3d at 802 (emphasis added).

*Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998)(footnotes omitted).

Although Laney asserts that other juvenile corrections officers were found sleeping while at work and were not dismissed nor disciplined for it, she has not provided evidence to support her claim. Huebner testified that he caught JCO Smiley sleeping on duty, and shortly thereafter Smiley resigned. Huebner Dep. 42:12-22. Huebner also heard allegations that JCO Hill had been sleeping while at work. On at least two occasions, Huebner attempted to catch him sleeping, but he never could substantiate the allegations. *Id.* 40:12-41:9. John Lister, the Labor Relations Officer, testified that he recalled one other employee who was disciplined for sleeping on the

18

job. JCO Williams was given a 15-day unpaid suspension. Although he was not terminated, he was not a probationary employee. Lister Dep. 21:6-22-8. Laney also testified that she had learned that JCO Halverson was found asleep and wrapped up in a blanket after she was forced to resign, but she did not have any knowledge about whether or not he was disciplined for this incident. Laney Dep. 157:18-160:9.

Laney testified that she witnessed JCO Tate's inadequate line movements and supervision of youths in the cafeteria. She maintains that JCO Tate was not disciplined for either of these deficits. Laney Dep. 127:10-129:11. Laney could not recall, however, if a supervisor was present when Laney witnessed Tate's rule violations. *Id.* Laney made similar accusations concerning JCO Hampton's line movements and supervision of youth in the cafeteria. *Id.* at 130-131. Laney did not recall whether or not supervisors were present. *Id.* Laney testified that she witnessed youth grabbing at JCO Timm's body. Laney was not aware whether JCO Timm was ever disciplined for failing to control the youths. *Id.* at 135.

Laney also alleged that other juvenile corrections officers engaged in much more serious conduct and were never disciplined for their actions. She maintains that JCO Glass failed to monitor the youths properly, which resulted in a youth being severely beaten by another youth. JCO Shores threw hot coffee on a youth, and JCO Flores broke a youth's arm, and, according to Laney, neither of these officers were removed. JCO Miller had six complaints of sexual harassment against him. JCO Tate's underwear and photographs were found in a youth's room. In her deposition, however, Laney concedes

19

that she has never examined the personnel files of these individuals, and she has not shown that they were probationary employees at the time these incidents occurred.

Plaintiff has not shown that other probationary employees who were accused of similar conduct, i.e., sleeping while on duty or being in a position of rest, were treated differently than she was. Because she was a probationary employee, she was not similarly situated to an employee that is covered by the collective bargaining unit. *White v. Ohio*, 2 Fed. Appx 453, 457 (6th Cir. 2001); ODYS has the sole discretion to discipline or discharge probationary employees. Although ODYS cannot discharge an employee for an unlawful reason–that is, based on racial animus–a probationary employee is not afforded the same protections that an employees who has successfully completed probation receives. As a result, plaintiff has failed to make a prima facie showing of race discrimination.

## B.    Sex Discrimination

Laney testified that she believed that criticisms about her line movements and accusations about contraband were also made in part due to her sex. *See* doc. 37-6 at 24-25. Laney's claim for discrimination based on sex fails for the same reasons discussed with respect to her claim for race discrimination. Because plaintiff has not come forth with any evidence demonstrating either that she was treated less favorably than a similarly situated person outside of the plaintiff's protected class or that demonstrate that her sex was a motivating factor for seeking her dismissal, defendant's motion for summary judgment is granted with respect to this claim.

### C.    Hostile Work Environment

Laney has not produced sufficient evidence to establish a claim for a hostile work environment. To establish a hostile environment prima facie case, plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual or racial harassment; (3) the harassment was based on her sex or race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) employer liability exists. *Hafford v. Seidner*, 183 F.3d 506, 512-13 (6th Cir. 1999).

A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and creates an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)(internal quotation marks and citations omitted).  As neither party disputes that plaintiff is a member of a protected class on the basis of her race and sex, this Court will begin by examining whether plaintiff provides sufficient evidence to state an issue of material fact as to whether the harassment she suffered was based on either her race or sex.

Here, Laney has not presented any evidence that she was subjected to harassment on the basis of her race or sex. Plaintiff asserts that she was subjected to excessive surveillance and discipline, but she has not shown that this was the result of

overtly racist or sexist motivation. With respect to Huebner, Laney has not introduced any evidence that his supervision of her was influenced by either her race or sex. In fact, the testimony of Marcus Patterson demonstrates that Huebner corrected the line movements of all juvenile corrections officers, regardless of their race or sex. *See* Patterson Dep. 43:17-44:8.

In order for a plaintiff to succeed on a hostile work environment claim, she also must show that the harassment she suffered was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Oncale*, 523 U.S. at 78. Typically, "'simple teasing,' offhand comments, and isolated incidents" on their own will not be grounds for a discrimination claim. *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998). However, when analyzing whether the harassment at issue was severe or pervasive, the Court must look at the totality of the circumstances, including the frequency of the conduct, its severity, its level of physical threat or humiliation, and whether it unreasonably interferes with an employee's work, rather than at individual events in isolation. *See Harris*, 510 U.S. at 23.

Laney maintains that white JCOs were permitted to harass and pick on her without fear of discipline from management and that black JCOs were subjected to racial animus by ODYS. Laney testified that JCO Decker called her a "black bitch." 198:1-200:24. Laney also reported that JCO Hampton told a youth that Laney was a black bitch. She maintains that she was called a bitch by another JCO in addition to being called that by youths. Doc. 37-08 at 10. Although Laney asserts that she was called

a black bitch by a co-worker, this isolated incident cannot be grounds for a discrimination claim because it was not sufficiently severe or pervasive to constitute a hostile work environment. Finally, even if this conduct constituted a severe and pervasive hostile work environment, Laney has not introduced any evidence to find employer liability. To establish employer liability, Laney would have to show that ODYS "knew or should have known of the [harassing] conduct, and that its response manifested indifference or unreasonableness." *Ejikeme v. Violet*, 307 Fed. Appx. 944, 950 (6th Cir. Jan. 29, 2009).

### D. Retaliation

Laney has not produced sufficient evidence to establish a claim for retaliation for exercising her rights his under Title VII. To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected activity; (2) this exercise of protected rights was known to defendants; (3) defendants took adverse employment action; and, (4) there was a causal connection between the protected activity and the adverse employment action. *See Hafford v. Sedner*, 183 F. 3d 506, 515 (outlining elements of retaliation claim in the context of Title VII).

Plaintiff maintains that she began complaining of harassment in June 2007 to Operations Manager Clarke and Assistant Deputy Superintendent Vincent. Laney testified that she spoke to Clark about people saying that she wasn't going to be there very long. 296:21-297:14. She testified that she wanted to speak to Mr. Vincent about the constant name calling and nitpicking. Laney Dep. 296:3-17. However, she did not tell

either Clark or Vincent that she believed the problems she was experiencing were based on either her race or sex. *Id.* at 297:9-23.

In September 2007, plaintiff complained of harassment and discrimination to Tricia Butler, Amy Grover, and John Lister. Laney also contacted the EEO officer, Julia Hines. On September 17, 2007, Laney had a telephone conversation with Ms. Hines concerning her complaints of discrimination. Laney Dep. 302:13-303:6. Complaining to the EEO officer about discrimination in the workplace constitutes protected activity under Title VII.

However, the uncontroverted evidence shows that the Superintendent Warye, the individual who made the decision to terminate Laney, was not aware that she had spoken to human resources staff regarding her allegations of discrimination and harassment. *See* doc. 45-3 at 1. Plaintiff argues that the temporal proximity of the adverse action to the protected activity strengthens the inference of retaliatory motive, but temporal proximity, alone, cannot be sufficient to make any inference as to the second element of the test–that the decision maker knew or was aware of plaintiff's protected activity. *Cain v. Potter*, No. 1:05-cv-2378, 2006 WL 3146435 at n. 61 (N.D. Ohio, Oct. 31, 2006).

In his deposition, Warye testified that he believed he watched two videos from the in-house surveillance system that showed Laney apparently sleeping. Warye Dep. 12:20-13:10. Warye also recalled that allegations had been made that Laney had fallen asleep while watching a youth at a hospital and that she had been providing youth with

24

food from outside the institution. *Id*. at 16-21. Warye gave Laney the option of being probationarily removed or resigning. *Id*. at 19:13-18. Warye considered both sleeping or being wrapped up in a blanket while working to constitute serious misconduct. *Id*. at 29:9-30:2.

Because plaintiff has not come forth with any admissible evidence showing that Warye knew that she had engaged in protected activity prior to making his decision to terminate plaintiff's probation, her claim for retaliation fails.

### E.    Religious Discrimination

Laney asserts a claim for failing to accommodate her religious beliefs based on Huebner's order to remove her head scarf. Title VII states in part:

> It shall be an unlawful employment practice for an employer-
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's. . . religion. . .or
> (2) to limit, segregate, or classify his employees. . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's. . . religion . . . .

42 U.S.C. § 2000e-2(a). Religion is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's. . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

To establish a prima facie case of religious discrimination, Laney must show (1) that she holds a sincere religions belief that conflicts with an employment requirement;

25

(2) she informed ODYS about the conflict; and (3) she was discharged or disciplined for failing to comply with the conflicting requirement. *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007).

Defendant is unwilling to concede that Laney's wearing of the head scarf was motivated by a sincerely held belief given her deposition testimony. In her deposition, Laney could not explain how the head scarf related to any particular practice of the Islamic faith. At the time she wore the head scarf, she had only identified herself as a Mulsim for a few months, and her knowledge of the Islamic faith was primarily based on internet sites that she had visited. Laney Dep. 227:1-15; 229:8-22. Apparently, Laney last wore a head scarf the day Huebner told her it violated the institution's regulations for JCOs. *Id.* 237:5-15. She was not disciplined for wearing the head scarf. *Id.* 240:10-12. Since leaving ODYS, Laney began attending a non-denominational church.

Plaintiff offers no evidence that she ever requested a religious accommodation. The evidence demonstrates that when instructed by Huebner to remove the head scarf because it did not conform with ODYS uniform policy, Laney did so. She did not seek an accommodation at anytime thereafter. Because Laney cannot show that she informed ODYS that she needed an accommodation in order to be permitted to wear her head scarf, she cannot establish a prima facie case of religious discrimination. Furthermore, Laney has not presented any evidence that the reason for her termination was related to her wearing the head scarf or because of her religious beliefs.

**V.      Conclusion**

For the reasons stated above, defendant ODYS's March 8, 2010 motion for summary judgment (doc. 45) is GRANTED. The Clerk of Court is DIRECTED to enter JUDGMENT for defendant ODYS. This case is hereby DISMISSED.


                                        s/ Mark R. Abel_____
                                        United States Magistrate Judge